Filed 1/21/16  P. v. Lester CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B260658 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA063333) |
| v. | |
| LUTHER D. LESTER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

Luther Dean Lester appeals from a judgment of conviction after jury trial, for second degree robbery (Pen. Code, § 211),[1] and second degree commercial burglary (§ 459); as to both counts it was found that the crimes were committed for the benefit of a street gang. (§ 186.22, subd. (b)(1)(A), (B), (C).) We find no prejudicial error, and therefore affirm the judgment.

## PROCEDURAL HISTORY

An October 28, 2014 amended information, alleged in count 1 that on or about June 14, 2014, appellant and William Ray Turner committed second degree robbery (§ 211); in count 2 that appellant and Turner committed an assault with a semi-automatic firearm (§ 245, subd. (b)); and in count 3 that appellant and Turner committed a second degree commercial burglary (§ 459). Count 1 alleged that Turner personally used a handgun, and count 3 alleged that Turner was armed with a handgun; count 2 alleged that appellant personally used a handgun in the commission of the crime. (§§ 12022.5, 1192.7, subd. (c) & 667.5, subd. (c).) As to each of the counts it was alleged that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subds. (b)(1)(A), (b)(1)(C).)

A few days later the information was amended to eliminate count 2 in its entirety, as well as to eliminate the firearm allegations in each of the remaining counts.

On November 13, 2014, a jury found appellant guilty of counts 1 and 3, and found the gang allegations true. On December 5, 2014, appellant was sentenced on count 1 to 13 years in state prison, constituting the middle term of three years, plus a consecutive 10 years for the gang enhancement. On count 3 he was sentenced to 12 years in state prison, constituting the middle term of two years, plus 10 years for the gang enhancement. The count 3 sentence was stayed pursuant to section 654. Appellant filed a timely appeal from the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL BACKGROUND

On June 14, 2014, John Ruh was working at The Dairy, a drive-through convenience store in Lancaster, California. At approximately 8:30 p.m., a man entered the store wearing shorts and no shirt, pressed a gun against Ruh's head and throat, and told Ruh to give him all the cash in the register, using threatening terms, including a reference to "gunpoint" and to a known street gang. A customer then in the store fled. Ruh opened the cash register and started to hand money to the man, who began to grab money from the register.[2]

When the man turned his back to leave the store, Ruh jumped on the man's back, with his arm around the man's neck. At that point a second man, who Ruh had not seen until then, pulled Ruh from the assailant's back, and the two men ran off, having taken about $200. Ruh then called the police, reporting that he had been robbed at gunpoint by two skinny "Black kids," one wearing black shorts with no shirt, the other (whose face he did not see) wearing a white shirt. He described the weapon as a small semi-automatic pistol. A few days later Ruh was able to identify Turner as the robber with the gun, from a six-pack lineup shown him by the police; he could state only that the second man was a Black male.

At Turner's home a search yielded shorts matching those Ruh had said his assailant was wearing, and a black BB gun under a mattress in one of the bedrooms.

Nicole Hill was appellant's girlfriend, and Turner's god-sister. Appellant was arrested at the house of Hill's grandmother in Palmdale, wearing a red hooded sweatshirt, blue jeans, a red belt, and black shoes with red laces. Hill agreed to talk to officers a few weeks after the robbery, and was read her *Miranda* rights on the way to the station. In a recorded interview (played for the jury at Lester's trial) Hill told the police that Lester and Turner "both bang with PDL," Pasadena Denver Lanes; that they had gang

---

[2] The jury viewed one or more video and audio recordings of the events in the convenience store, and was provided transcriptions of the audio portions of the recordings.

3

nicknames; that appellant had "Pasadena" tattooed on his back; and that Turner says "Blood" a lot, and often talks with Lester about the Pasadena Denver Lanes gang.

Hill told the police that when she was at Turner's house babysitting on the afternoon of the robbery, Turner and appellant had left the house as it was getting dark, sometime after 5:00 p.m.; they had returned something like an hour later; Turner then left again perhaps 10 minutes later, and appellant also left after another five minutes. When they left, Turner was wearing shorts with no shirt, and appellant was wearing a red sweater, gray sweatpants, and shoes with red laces.

When Turner and appellant returned to the house, appellant told Hill they had gotten some money, something over $100. When Hill asked him from where, he told her "they hit a lick"—which Hill understood to mean they had robbed someone. Appellant told her that Turner "went in the store first and then, I guess, he's like, I, I went in the store to check on [Turner] what he was doing, I guess, when [Turner] was trying to rob the . . . ." "I guess [Turner] was fighting with the guy and they went, [appellant] said I went, he went in there to try and help [Turner], whatever. And then I guess they went off and they started running off, I guess." According to Hill, appellant said he guessed Turner went into the convenience store because he was "tired of being broke," or that Turner had said, "I'm tired of being broke." Hill said that appellant told her that he had seen Turner take cash from the register, and that when he went to help Turner, he had "socked that nigger" off Turner. She identified appellant and Turner from a surveillance video taken at The Dairy. She also identified the gun, which Turner had told her was a fake.

Hill (who did not testify voluntarily, and was taken into custody in order to obtain her trial testimony) testified that she did not know whether Turner and appellant were Pasadena Denver Lanes members; she had no recollection whether on the day of the robbery Turner and appellant had left the house together, how long they were gone, or whether they had money when they returned; she did not remember them saying they had "hit a lick" or anything at all about a robbery; and she did not remember identifying

4

appellant as the man who could be seen in the surveillance video, pushing the robbery victim off Turner's back.

Detective O'Neal, a sheriff's department detective specializing in gang members and gang-related crimes in Los Angeles County, testified that Pasadena Denver Lanes is one of at least hundreds of Blood gangs in the Los Angeles County area, with over 600 members in total and 30 to 40 members in the Antelope Valley. Common tattoos identifying Pasadena Denver Lanes membership are the word "Pasadena" or "City Pasadena," "PDL," "D," a red rose (for the area and the color red signifying a Blood gang affiliation), or the region's area code, "626." But with the Pasadena Denver Lanes, as with other gangs, the threat of serious repercussions—"usually extremely violent problems"—is a deterrence against false claims of gang membership. "[G]enerally speaking, no, you don't go around claiming that you're a gang member if you're not really a member of that gang. Like I said, there's dire consequences for that."

O'Neal testified that the motivation of street gangs in the Los Angeles basin generally, as well as of Pasadena Denver Lanes, is to make money through criminal enterprise, using violent robberies, assaults, and narcotics sales, with the monetary proceeds going to the gang through "taxing." They make money through control of their area, using violence and intimidation—including through display of gang tattoos—to maintain the fear and respect of people, and of other gangs. This benefits the gang: if members of other gangs fear the local gang, the other gangs will respect that gang's territory or turf; and if people in the area fear the gang, their fear will deter them from reporting the gang's criminal activities. "So when a member is displaying gang tattoos, I think the general law biding [*sic*] community is just going to avoid them because they know they are gang members."[3]

Speaking about gangs in general, O'Neal told the jury that a gang member's crime benefits the gang's reputation, and not just the reputation of the individual gang member.

---

[3] O'Neal testified that although these "turf" rules normally govern gang activities, the Pasadena Denver Lanes gang is now "basically without a turf" in the Antelope Valley.

It benefits the reputation of the individual perpetrator, because "any criminal activity improves your hierarchy within the gang." And it also benefits the gang. "So when they claim the gang, it benefits the gang because the gang becomes more feared and there's no consequences for the crime that they commit."

O'Neal testified that gang members rarely act alone when committing crimes, for two reasons: First, gangs are a "brotherhood," giving "power in numbers." While one perpetrator might not be so intimidating, if you are victimized by multiple gang members, "you are probably going to submit because you're outnumbered." Second, the gang is also a brotherhood in the sense that its members are obligated to protect one another; a member's failure to defend his fellow gang members "at all costs," will result in the gang's retaliation. If a fellow gang member is attacked in any way, "you better not just stand back and watch, or run away, because you're gonna be the victim of your own gang violence."

O'Neal had never met either Turner or appellant, but opined for the jury that both are Pasadena Denver Lanes members. He identified Turner as a Pasadena Denver Lanes member by tattoos of "626" tattoo on his chest and "Pasadena" on his forearm; and from his arrest for tagging "PDL" in the area. O'Neal based his opinion of appellant's Pasadena Denver Lanes gang membership on the large "Pasadena" tattooed across appellant's back and the "PDL" tattooed on his forearm; and on appellant's affiliation with Turner, a Pasadena Denver Lanes member, and "some of the words spoken during the commission" of the robbery with which appellant was charged.

O'Neal testified that displaying gang tattoos and claiming gang affiliation are very intimidating, and that "blood" is an expression of gang membership, although it does not identify a particular gang. He testified that committing a robbery not only obtains money for the perpetrator, but also benefits the gang and its criminal activities. That is because "typically" gangs receive a tax—a percentage of the proceeds—in order to fund its criminal activities, and in the case of the Pasadena Denver Lanes, to pay an associated prison gang to protect its members who have been sentenced to life in prison. And it is

also vital to the gang to have another member nearby in order to assist and protect a member who is involved in a crime.

O'Neal admitted that he had no information that anyone was actually intimidated by the evidence of gang affiliations in this case.[4]  And he admitted that the occurrence of a robbery does not itself show gang involvement, because making money is the objective of every robbery, whether gang related or not; and "It's not uncommon for gang members to just go out and spontaneously commit a robbery" because they need some money, or as a crime of opportunity, with no direction or gang approval.  O'Neal had no information about the actual use of any of the robbery proceeds, and no knowledge that any of the money was put to any gang-related use.

O'Neal testified that a crime such as the charged robbery was done for the benefit of Pasadena Denver Lanes.  Responding to a hypothetical question, he stated his opinion that a crime with the following characteristics would "absolutely benefit Pasadena Denver Lanes":

- Two Pasadena Denver Lanes gang members walk down the street together.  One is shirtless, and visible tattoos say "626" and "Pasadena."
- The shirtless one says to the other, "I'm sick of being broke."  He then enters a convenience store and pulls out a replica (fake) handgun, while the other remains outside the store.
- The one who entered the store says to the clerk, "Bloods.  Give us everything you got," then takes several hundred dollars from the cash register and turns to leave the store.
- After the robber turns away, the clerk jumps on the robber's back.  The second person then enters the store and pulls the clerk from the robber's back.  The two gang members then run from the store.

---

[4] Ruh did not testify that he saw any tattoos on the robber, or that he heard any reference to a gang or gangs.  O'Neal conceded that Turner's tattoos are "not very dark," and Turner is "more of a dark skinned individual"; his tattoos, although not "enormously bright," nevertheless "are obviously visible when the shirt's off."

7

O'Neal based this opinion on a number of factors, including the intimidation at the time of the robbery evident from Turner's shirtless display of his gang tattoos and claim of gang association; from the fact that Pasadena Denver Lanes and other such gangs need "tax" money for protection of their members in and out of prison; and from the fact that gang-related crimes almost invariably are conducted by more than one member, in order to provide a perpetrator with help if necessary. The facts on which he relied for his opinion were "that these guys are gang members; they're working in association with each other, from the same gang and they committed this crime displaying their gang and calling out their blood gang in order to effectively commit that crime. Whether it worked or not, doesn't matter. They're gang members who committed a gang crime."

The prosecution agreed. It responded to the defense contention that the evidence failed to identify any benefit to the gang from the robbery, arguing that no benefit to the gang need be shown; the prosecution must show only that the crime was *either* "in association with *or* for the benefit of a gang"; and that the evidence showed that appellant "*intended to help a gang member* commit a crime." The crime was done "in association with" a gang, because both Turner and appellant are gang members; and appellant intended to help Turner commit the robbery, because he entered the store with the intention to help his fellow gang member escape Ruh's grasp.

As noted above, the jury found appellant guilty of the robbery and the burglary, and found the gang-enhancement allegations true.

## DISCUSSION

Counsel for appellant filed a brief raising no issues (*People v. Wende* (1979) 25 Cal.3d 436), after sending him the record on appeal and advising him of his right to file a supplemental brief and to request that counsel be relieved. We have received no communications from appellant.

After undertaking our own independent review of the record (*People v. Wende*, *supra*, 25 Cal.3d at pp. 441-442), and recent Supreme Court and Court of Appeal

8

authority, we have concluded that the record discloses no arguably meritorious ground for reversal of the judgment or modification of the sentence in this case.

More specifically, we conclude that the evidence in the record is sufficient as a matter of law to satisfy the requirements for enhanced punishments provided by section 186.22, subdivision (b), constituting substantial evidence that the crimes charged were "committed for the benefit of, . . . or in association with a criminal street gang"; and that the crimes were "committed with the specific intent to promote, further, or assist in any criminal conduct by gang members." (CALJIC No. 17.24.2; see CALCRIM No. 1401 (rev. Feb. 2014).)[5] The jury was entitled to infer that the felonies committed by two gang members were done for the benefit of the Pasadena Denver Lanes gang, based on the evidence that robbery is a typical criminal activity for that gang, both in order to fund the gang's criminal activities and to enhance its reputation; that in perpetrating the felonies one gang member made a shirtless display of intimidating gang tattoos, and verbally identified his gang's "blood" gang affiliation to the victim; and that a second gang member joined in the felonies in order to assist his fellow gang member's escape. (*People v. Albillar*, *supra*, 51 Cal.4th at pp. 60, 63 [expert opinion that particular criminal conduct benefited gang (by e.g., enhancing its reputation) supports inference that criminal conduct was "committed for the benefit of … a[] criminal street gang" within the meaning of section 186.22, subdivision (b)(1)], 68 ["if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote,

_____

[5] In considering the sufficiency of the evidence to support a gang enhancement, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

9

further, or assist criminal conduct by those gang members"]; *People v. Ramirez* (2009) 172 Cal.App.4th 1018, 1038-1039 [where evidence showed felonies would have financially supported gang, jury could conclude that defendant committed offenses "for the benefit of, at the direction of, or in association with" a criminal street gang].)

Because the record discloses no arguably meritorious ground for reversal of the judgment or modification of the sentence in this case, we affirm the judgment of the superior court.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:



ROTHSCHILD, P. J.



JOHNSON, J.